## W. H. EDGAR & SON v. GROCERS' WHOLESALE CO.

(Circuit Court of Appeals, Eighth Circuit. July 9, 1924.)

No. 6382.

Sales ⬤ 85(2)—Mere decline in market price held not to render performance of contract "commercially impracticable."

In the absence of a special, fixed, and widely accepted trade meaning of the phrase "commercially impracticable," a provision in a contract for sale of sugar at $25.50 per 100 pounds that it should be subject to "strikes * * * and other extraneous causes which render performance commercially impracticable" must be construed in its common ordinary sense, and

did not justify refusal to accept and pay merely because of a decline in the market price of $3 per 100.

In Error to the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Action at law by W. H. Edgar & Son, a partnership, against the Grocers' Wholesale Company. Judgment for defendant, and plaintiffs bring error. Reversed.

See 298 Fed. 878. On petition for rehearing. Denied.

Harley H. Stipp, Eugene D. Perry, Robert J. Bannister, Vincent Starzinger, and Fred A. Little, all of Des Moines, Iowa, for defendant in error.

Before LEWIS, Circuit Judge, and SYMES and PHILLIPS, District Judges.

SYMES, District Judge. Counsel for defendant in error insist in their petition for a rehearing that the court should have given a definite meaning to the words "causes which render performance commercially impracticable," found in the contract for the sale and purchase of the sugar. Those words occur in the sentence reading this way: "All contracts subject to strikes, fires, transportation and business conditions and other extraneous causes which render performance commercially impracticable." For these reasons it did not seem to us necessary to do so: (1) It did not appear from the evidence in the case, nor from the authorities cited, nor were we able to find elsewhere a fixed meaning given to those words in the commercial world. (2) The only meaning which defendant in error insisted we should give to them was rejected, for reasons stated in our opinion.

We held that simply because sugar had dropped $3 per 100 pounds between the time the contract was made and the time of notice from the buyer to the seller that the buyer would not receive and pay for the balance of the sugar did not render performance of the contract commercially impracticable. Admittedly, the seller stood ready to deliver in compliance with his obligations to do so. When the buyer gave notice that it would not receive the sugar it did not claim that performance of the contract was commercially impracticable. On July 30 it addressed a letter to the seller in which it requested a cancellation of the contract, and said: "We feel that you will have no trouble in placing this contract elsewhere." The seller at once wired refusal to cancel, and the buyer then gave notice that it would not accept the sugar. Inasmuch as the buyer felt that the seller would "have no trouble in placing this contract elsewhere," we confess that we felt some trouble in believing that the buyer even thought that performance of the contract was commercially impracticable then, and for that reason refused to further perform. That the contention was wholly without merit was demonstrated, we think, by the fact that the buyer then purchased elsewhere to supply its needs on a falling market and doubtless at a lower price. There was no basis for the belief, no ground on which a finding of fact could rest, that performance of this contract was commercially impracticable, in the face of the admitted fact that the buyer continued to enter into and perform like contracts for the purchase of sugar from others; and the record does not disclose that like transactions were not being carried on throughout the country. A transaction is certainly not commercially impracticable of performance when like transactions are being had and carried out in commerce. If a commodity is being dealt in on the markets, no one can contend in good faith that its purchase and sale is commercially impracticable. Throughout the life of this contract the defendant was buying sugar from others and selling it to the retail trade. There was no embargo; it moved freely from manufacturer to consumer at quoted prices. There was no financial panic or restrictions that prevented its purchase. There was neither strike nor other cause that prevented or seriously interfered with its carriage and delivery. In short, there was nothing that prevented, interfered with or retarded the sale, purchase, delivery, and receipt of sugar at current prices at the time defendant refused to accept the sugar.

The only reason assigned why defendant did not accept and pay for the sugar at the contract price was that the price declined after the contract of purchase was made. This, defendant contends, rendered "performance of the contract commercially impracticable." But we concluded that this defense was not made out; that there were no facts sustaining it or tending to sustain it. All that was needed was delivery by the seller, which they were ready to make, and acceptance and payment by the buyer, which it refused, because sugar had fallen in price. In determining the rights of the parties to this litigation, we saw no necessity of going beyond the facts in the case. But, yielding to the insistence of counsel, we come to consider what meaning should

be attributed to the clause in the contract, as applied to the character of transaction here presented. In the absence of a special, fixed, and widely accepted trade meaning, words are taken in their common and ordinary sense.

Counsel for defendant do not expressly claim that the phrase has a special trade meaning. They mistakenly say the court wholly disregard the phrase, and then argue that the fall in price rendered performance commercially impracticable. They cite and rely upon U. S. v. Thornburg (D. C.) 6 Fed. 41; Id. (C. C.) 7 Fed. 190; U. S. v. Roehrig (D. C.) 51 Fed. 302; Ellis v. Coal Co., 166 Iowa, 656, 148 N. W. 887; Wooters v. Railroad Co., 54 Tex. 294; Wilson v. Church, 13 Ch. Div. 1; Mineral Park Land Co. v. Howard, 172 Cal. 289, 156 Pac. 458, L. R. A. 1916F, 1, and Fidelity & Casualty Co. of New York v. Lowenstein, 97 Fed. 17, 38 C. C. A. 29, 46 L. R. A. 450. The Thornburg and Roehrig Cases presented the same question. They both required the construction of a statute regulating steam vessels carrying passengers. The statute forbade the conveying of petroleum and other inflammable articles on passenger steamers, but provided that "refined petroleum, which will not ignite at a temperature less than 110 deg. of Fahrenheit thermometer, may be carried on board such steamers upon routes where there is no other practicable mode of transporting it." It was held that the word "practicable," as used in the statute, means commercially practicable, as distinguished from physically or mechanically practicable. It was said in the Thornburg Case: " *    *    * Whether a mode of transportation between any two points is practicable, must be decided with reference to the commerce between those points. If the rates charged for transportation by rail would amount to a prohibition of the traffic, it would not be a practicable mode of transportation within the meaning of this statute."

The facts in Wilson v. Church were recited and the conclusion there reached approved, wherein it appeared that bondholders who made a loan for the purpose of constructing a railroad sought to have the funds returned to them on the ground that the scheme had become abortive. It was shown that the funds advanced were insufficient to complete the railway, that the railway company had no means of raising further funds, and that in a business sense it had become impracticable to carry the scheme into effect. A return of the funds was ordered. In each of those cases the court found that while the acts to be performed were physically practicable, it was also found that they were not commercially practicable. But in this case we have no doubt that the acceptance of and payment for the sugar by the defendant was both physically and commercially practicable.

In the Ellis case the Coal Company agreed to pay Ellis a specified royalty on all lump coal to be mined from forty-four acres, to commence mining on a certain day and "to continue such mining of such coal until all the merchantable and minable coal is taken from said land." The company mined coal from the premises for several years and then ceased operations. It was not required to mine from a vein less than three feet and nine inches thick. Ellis sued for the minimum royalty after operations ceased, and alleged that all of the land was underlaid with a seam of minable coal over three feet and nine inches in thickness, and that it was good merchantable coal and could be mined by the coal company at a profit, and that all of it had not been taken out. The trial court instructed the jury that "the term 'merchantable and minable coal,' as used in these instructions, means coal that can be mined and sold at some profit to the operator, with reasonable expenditure, labor, and effort, in accordance with the methods approved among practical miners in that territory." The Supreme Court held that the word "merchantable" had reference to the quality of coal, rendering it salable on the market, and that whether the coal was minable depended on its accessibility, the condition of the earth over it, interference by water, whether free from or mixed with other substances, and the cost of mining and bringing the coal to the surface. The court said that by the use of the expression "merchantable and minable" the parties evidently intended that the coal to be paid for should be salable on the market, and that it be such as could be mined at a cost such as that defendant could put it on the market at some profit to itself. Clearly that case has no bearing. Merchantable had reference to the quality of the coal minable, its accessibility, and cost of production.

In the Wooters Case he was sued on his subscription of $1,000, which he gave for and in consideration of the enhanced value to accrue to his land, payable on condition that the railway company "establish and have a depot as near the courthouse as practicable and not to be more than one mile

from said courthouse." In his answer he alleged that the agents of the railway company, for the purpose of inducing him to subscribe, fraudulently represented to him that the depot would be located at a point about 200 yards from the courthouse, and that in violation of that representation it had been located at a distance of about 1,000 yards therefrom. The trial court held the answer bad and entered judgment against Wooters. Its rulings were sustained by the Supreme Court, and that court, after saying that the nearest possible point at which the depot could have been located would have been at the nearest point where land for that purpose could have been purchased or condemned, regardless of cost, held that "if this was what was intended, it was idle for appellee to have stipulated that the point at which it would establish its depot should be not more than a mile from the courthouse. Plainly the word 'practicable' was not used in this contract as synonymous with 'possible,' but was used and understood by the parties to this contract in its usual and ordinary sense, as binding appellee to locate its depot at the nearest point within a mile of the courthouse, at which it could be done at a reasonable and ordinary cost, with reference to all the circumstances under which it was to be done, and in view of the object and purpose inducing the contract."

In the Mineral Park Land Company Case the defendants agreed to take from the lands of plaintiff all the gravel and earth necessary in the construction of the fill and cement work on a proposed bridge and pay therefor a specified amount per cubic yard. The total amount of earth and gravel used by the defendants was 101,000 cubic yards, only about half of which was taken from plaintiff's land. Plaintiff in its action charged that there was enough gravel and earth on the land to supply the entire amount required and sued for damages. The answer denied that there was any earth and gravel on the land, in excess of that taken, available for the work mentioned in the contract. The trial court found that the defendants did take all of the available earth and gravel from plaintiff's premises, in that it took and removed all that could have been taken advantageously to defendants, and all that was practical to take and remove from a financial standpoint; that any greater amount could have been taken only at a prohibitive cost, that is, at an expense of 10 or 12 times as much as the usual cost per yard; and that no greater quantity could have been taken than was taken, except by the use at great expense of a steam dredger, and the earth and gravel so taken could not have been used without first having been dried at great expense and delay. It was further found that the parties were not under any mutual understanding regarding the amount of available gravel and that the contract was entered into without any calculation on the part of either of the parties with reference to the amount of available earth and gravel on the premises. The trial court was apparently of opinion that the case was governed by the principle that where a party has agreed without qualification to perform an act which is not in its nature impossible of performance, he is not excused by difficulty of performance or by the fact that he becomes unable to perform. But the Supreme Court, while recognizing this principle of law, in reversing judgment in favor of plaintiff, said: "It is, however, equally well settled that where performance depends upon the existence of a given thing, and such existence was assumed as the basis of the agreement, performance is excused to the extent that the thing ceases to exist or turns out to be non-existent. * * * And, in determining whether the earth and gravel were 'available,' we must view the conditions in a practical and reasonable way. Although there was gravel on the land, it was so situated that the defendants could not take it by ordinary means, nor except at a prohibitive cost. To all fair intents, then, it was impossible for defendants to take it."

How different from the facts here. This contract was not entered into on the assumption that there would be no fluctuation in the price of sugar. Defendant does not claim that it was. It does claim that it understood that it was not to be binding if there should be a great fluctuation in sugar. The plaintiff had no such understanding. How great was the fluctuation to be? The contract was not made on the assumption by the parties that the price of sugar would not fluctuate as much as $3 per 100 pounds. The Supreme Court of California, in the Mineral Park Land Co. Case, then quoted from Beach on Contracts: "A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." And it added: "We do not mean to intimate that the defendants could excuse themselves by showing the existence of conditions which would make the performance of their obligation

more expensive than they had anticipated, or which would entail a loss upon them. But where the difference in cost is so great as here, and has the effect, as found, of making performance impracticable, the situation is not different from that of a total absence of earth and gravel."

We find nothing in the other case relied upon (97 Fed. 17, 38 C. C. A. 29, 46 L. R. A. 450) that requires notice. It seems wholly irrelevant.

From the cases thus considered and relied upon by defendant we conclude: (1) None of them give a trade meaning to the phrase found in this contract; and (2) none of them deal with facts in any sense analogous in principle to the facts in this case. No case has been cited, nor do we believe authority can be found, that holds or intimates that a rise or fall of 12 per cent. in price of a commodity above or below the contract price renders performance commercially impracticable. In the California gravel case (Mineral Park Land Co. v. Howard, supra) the cost of producing the gravel had increased 10 to 12 fold, yet that alone was not sufficient to relieve the defendant from liability. The court concluded that the physical facts which were assumed to exist and did not exist brought the case within an exception to the general rule. Here the defendant agreed to purchase plaintiff's sugar at $25.50 per 100 pounds, and to accept delivery in August. Early in that month it notified the plaintiffs that it would not receive the sugar, and the sole reason it assigns for doing so is the fact that sugar had decreased $3 per 100 in price. It then purchased elsewhere and from others sugar that it needed in its business and sold it to the retail trade. Either party could have protected itself against fluctuations by a simple statement to that effect in the contract, but neither desired to do so, both chose to take a chance on the future market.

One of the definitions given by Webster to the word "impracticable" is this: "Incapable of being practiced, performed, or accomplished by the means employed or at command." The Supreme Court of South Carolina, in Des Portes v. So. Ry. Co., 87 S. C. 160, 69 S. E. 148, applied it in its common and ordinary sense. The plaintiff there had a mileage book. He was familiar with the regulations printed on defendant's time table, requiring the exchange of mileage transportation for passage tickets, "except from stations where there are no agents, or where the agent is not on duty, or for any other valid reason making it impracticable for the passenger to have his or her mileage exchanged for a passage ticket." He rode to Blackville on a ticket which he had obtained for mileage. He decided to go on to Williston. Blackville is an agency station. The train stopped there 25 minutes, waiting on connections. He remained on it and did not make the exchange for a passage ticket. Not having the ticket, he was later put off. He testified that it was not practicable for him to get off and get the ticket, that he did not think he had time, that no one told him the train would stay there that length of time, that the train was due at Blackville at 11:35, and at Reynolds, seven miles beyond, at 11:42, and he thought the train would leave any minute; but he made no inquiry and thought they would take his mileage. The court said: "A thing is impracticable when it cannot be accomplished with available means. 'Impracticable' is defined as incapable of being effected from lack of adequate means." And it was held there was no breach of duty by defendant and no basis for recovery. The defendant assigns no definite meaning to the phrase. It has not ventured to say at what particular point in the fall of the price of sugar performance of the contract on its part was rendered commercially impracticable, or at what definite point in the rise of the price of sugar performance of the contract by plaintiff would have been rendered commercially impracticable.

We think the common and ordinary meaning of the word "impracticable" should be applied here, and in the absence of a showing that because of financial panic or depression defendant did not have and could not obtain on reasonable terms during the life of the contract, the contract price it agreed to pay, then performance of the contract on its part was not rendered commercially impracticable. Under the facts in this case we can conceive of no other commercial reason or cause which would have rendered payment for the sugar impracticable. Delivery was tendered, and if defendant had the contract price, or, if solvent, the funds were available to it by reasonable effort and at reasonable cost, then payment had not been rendered commercially impracticable. The record has been read again. We are convinced that the defendant wholly failed in its defense, and that judgment should have gone for plaintiff.

Petition for rehearing denied.